Approved: _____
JARROD L. SCHAEFFER
Assistant United States Attorney

Before: HONORABLE ONA T. WANG
United States Magistrate Judge
Southern District of New York

------------------------------------X

**18 MAG 10242**

UNITED STATES OF AMERICA,

-v.-

**SEALED COMPLAINT**

VALENTYN BELAN,
    a/k/a "Belan Valentin,"
    a/k/a "Belan Valentyn,"
    a/k/a "Belan Valentyn
        Volodymyrovych,"
    a/k/a "Belan Valentyn
        Volodymyrovich,"
    a/k/a "Valentino,"
OLENA CHUMACHENKO, and
NIKA KHRYSTYCH,
    a/k/a "Veronika Melnichenko,"

Violation of
18 U.S.C. § 1349

COUNTY OF OFFENSE:
NEW YORK

Defendants.

------------------------------------X

SOUTHERN DISTRICT OF NEW YORK, ss.:

JUSTIN ELLARD, being duly sworn, deposes and says that he is a Special Agent with the United States Attorney's Office for the Southern District of New York ("SDNY"), and charges as follows:

**COUNT ONE**

(Conspiracy to Commit Wire Fraud)

1. From at least in or about October 2008 up to and including December 2018, in the Southern District of New York and elsewhere, VALENTYN BELAN, a/k/a "Belan Valentin," a/k/a "Belan Valentyn," a/k/a "Belan Valentyn Volodymyrovych," a/k/a "Belan Valentyn Volodymyrovich," a/k/a "Valentino," OLENA CHUMACHENKO, and NIKA KHRYSTYCH, a/k/a "Veronika Melnichenko," the defendants, and others known and unknown, willfully and knowingly did combine,

2

conspire, confederate, and agree together and with each other to commit wire fraud in violation of Title 18, United States Code, Section 1343.

2.   It was a part and an object of the conspiracy that VALENTYN BELAN, a/k/a "Belan Valentin," a/k/a "Belan Valentyn," a/k/a "Belan Valentyn Volodymyrovych," a/k/a "Belan Valentyn Volodymyrovich," a/k/a "Valentino," OLENA CHUMACHENKO, and NIKA KHRYSTYCH, a/k/a "Veronika Melnichenko," the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

3.   I have been a Special Agent in the SDNY for approximately two years. Prior to serving as a Special Agent in the SDNY, I was a Special Agent for the Diplomatic Security Service approximately for four years.  I have been personally involved in the investigation of this matter and I base this affidavit on that personal experience, as well as on my conversations with other law enforcement agents, and my examination of various reports and records.  Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all of the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

SUMMARY OF THE SCHEME

4.   Based on the facts set forth below, I respectfully submit that there is probable cause to believe that VALENTYN BELAN, a/k/a "Belan Valentin," a/k/a "Belan Valentyn," a/k/a "Belan Valentyn Volodymyrovych," a/k/a "Belan Valentyn Volodymyrovich," a/k/a "Valentino," OLENA CHUMACHENKO, and NIKA KHRYSTYCH, a/k/a "Veronika Melnichenko," the defendants, and others known and

3

unknown, have participated in a scheme that operated, in sum and substance, as follows in the Southern District of New York and elsewhere:

      a. BELAN, together with others known and unknown, including defendants herein, devised and directed a long-running scheme intended to obtain money and property from a victim whose identity is known to me ("Victim-1") by soliciting investments in false or fraudulent business opportunities purportedly located in Ukraine and elsewhere.

      b. The false or fraudulent business opportunities in which Victim-1 ultimately was induced to invest included, among others, purported investments in real estate, mining, and oil production.

      c. In order to induce Victim-1 to invest in these false or fraudulent business opportunities, BELAN, CHUMACHENKO, and KHRYSTYCH, together with others known and unknown, deceived Victim-1 about the legitimacy of the purported business opportunities through, among other things, misrepresentations, falsified documents, meetings with fake government officials or business partners, and counterfeit United States currency.

      d. BELAN, CHUMACHENKO, and KHRYSTYCH, together with others known and unknown, used the above tactics, among others, to obtain millions of dollars in money and property from Victim-1.

      e. BELAN, CHUMACHENKO, and KHRYSTYCH, and others known and unknown, have used facilities of interstate and foreign commerce to effectuate their scheme, including electronic messages containing video and voice communications, and international and domestic wire transactions.

<u>VICTIM-1'S INTIAL REAL ESTATE INVESTMENTS</u>

    5. Based on my interview with Victim-1, as well as my review of documents and other records provided by Victim-1, I have learned, among other things, the following:

      a. In or about March 2008, Victim-1 traveled from Hong Kong to Ukraine in order to investigate potential real estate purchases. During this trip, Victim-1 was introduced to VALENTYN BELAN, a/k/a "Belan Valentin," a/k/a "Belan Valentyn," a/k/a "Belan Valentyn Volodymyrovych," a/k/a "Belan Valentyn Volodymyrovich," a/k/a "Valentino," the defendant, who had been hired as a travel agent in connection with Victim-1's trip.

b.  On at least one occasion during Victim-1's trip to Ukraine, BELAN invited young women to accompany BELAN and Victim-1. BELAN described these women to Victim-1 as university friends whom BELAN employed as translators at his travel agency.

c.  In or about October 2008, BELAN traveled to Hong Kong and met with Victim-1. BELAN proposed to Victim-1 that he and BELAN operate a travel agency business together in Ukraine. Victim-1 agreed, and BELAN and Victim-1 opened a travel agency business in Kherson, Ukraine.

d.  In or about October or November 2009, Victim-1 returned to Ukraine. During this trip, BELAN showed Victim-1 several properties and encouraged Victim-1 to purchase seven buildings and one football field for approximately $15 million (the "Ukrainian Properties"). Victim-1 ultimately agreed to purchase the Ukrainian Properties for approximately $9 million.

e.  From in or about October or November 2009 through October or November 2010, Victim-1 wired money to a Ukrainian bank account to fund the purchase of the Ukrainian Properties. During this period, Victim-1 made several additional trips to Ukraine to sign documents related to the purchase of the Ukrainian Properties.

f.  All aspects of the purchase of the Ukrainian Properties were arranged by BELAN. Victim-1 further authorized BELAN to access and use funds wired to the Ukrainian bank account for the purpose of completing the acquisition of the Ukrainian Properties.

g.  Victim-1 and BELAN agreed that BELAN would secure tenants to rent the Ukrainian Properties, and that BELAN would otherwise manage the daily affairs of the Ukrainian Properties. Following the purchase of the Ukrainian Properties, BELAN periodically wired to Victim-1 funds totaling approximately $50,000 per month, which BELAN represented to be rental income from the Ukrainian Properties.

h.  In or about late 2013, BELAN stopped wiring funds from rental income to Victim-1.

i.  After BELAN stopped wiring funds to Victim-1, Victim-1 repeatedly requested that BELAN wire rental income from the Ukrainian properties. BELAN did not do so.

j. In or about February 2014, BELAN told Victim-1 that all tenants at the Ukrainian properties had left due to an international conflict between Ukraine and the Russian Federation.

k. In or about 2015, BELAN began telling Victim-1 that Victim-1 was required to pay property taxes in connection with the Ukrainian properties.

l. Since in or about 2015 up to and including in or about November 2018, BELAN has requested that Victim-1 send BELAN continually increasing amounts for the payment of property taxes on the Ukrainian properties.

## FRAUDULENT MINE PROPOSALS

6. Based on my interview with Victim-1, as well as my review of documents and other records provided by Victim-1, I have also learned, among other things, the following:

a. In or about March 2010, Victim-1 wished to invest in natural resources exportable to China. Victim-1 communicated this interest to VALENTYN BELAN, a/k/a "Belan Valentin," a/k/a "Belan Valentyn," a/k/a "Belan Valentyn Volodymyrovych," a/k/a "Belan Valentyn Volodymyrovich," a/k/a "Valentino," the defendant.

b. Shortly thereafter, BELAN proposed to Victim-1 that Victim-1 should purchase a mine in Ukraine. BELAN proposed to introduce Victim-1 to a particular individual represented by BELAN to be a minister in the Ukrainian government with influence regarding mines and mining (the "Minister").

c. Based on Victim-1's description of subsequent statements made to Victim-1 by OLENA CHUMACHENKO, the defendant, I have learned that the Minister was not in fact a minister in the Ukrainian government.

d. While Victim-1 was in Ukraine in or about March 2010, BELAN arranged for Victim-1 to be escorted in what Victim-1 believed to be a motorcade to a location that BELAN represented was the private home of the Minister (the "Residence").

e. Based on Victim-1's description of subsequent statements made to Victim-1 by CHUMACHENKO, as well as my review of pictures of the Residence, I have learned that the Residence was in fact a Ukrainian hotel.

6

   f. While at the Residence, Victim-1 met with the Minister for approximately one hour. Because the Minister did not speak the same language as Victim-1, all communication was translated by BELAN.

   g. The Minister proposed that she and Victim-1 enter into a partnership through which the Minister and Victim-1 would purchase a Ukrainian mine containing rare-earth elements ("Mine-1"). The Minister informed Victim-1 that she was looking for a Chinese partner, and referenced the Ukrainian Properties as her reason for wishing to partner with Victim-1 in particular.

   h. After meeting with the Minister, Victim-1 was introduced to a particular individual represented by BELAN to be a wealthy buyer who regularly purchased mined material from the Minister ("Buyer-1"). Because Buyer-1 did not speak the same language as Victim-1, all communication was translated by BELAN.

   i. Buyer-1 showed Victim-1 documents that appeared to be bank statements, which appeared to show that Buyer-1 made purchases from the Minister each day totaling approximately $500,000.

   j. Prior to and after meeting the Minister, Victim-1 attempted to learn more about the Minister but was unable to find additional information. Victim-1 told BELAN that Victim-1 was unable to find any information concerning the Minister, and BELAN stated that the Minister was a "secret" minister.

<u>VICTIM-1 INDUCED TO INVEST IN MINE-1</u>

   k. Victim-1 expressed interest in partnering with the Minister to purchase Mine-1, but expressed a desire to view the site before entering into an agreement.

   l. The Minister informed Victim-1 that the site was in Donetsk, Ukraine, and BELAN arranged for Victim-1 to travel to that location.

   m. BELAN traveled with Victim-1 to a location approximately one hour from Donetsk. BELAN also provided Victim-1 with a gas mask that BELAN stated was necessary to protect Victim-1 from radiation at the site.

   n. After Victim-1 returned to Hong Kong from Ukraine, BELAN inquired repeatedly whether Victim-1 had decided to invest in Mine-1.

7

o. In or about August 2010, BELAN informed Victim-1 that the Minister would like to meet Victim-1 in Dubai, United Arab Emirates. Victim-1 agreed to travel to Dubai for the meeting.

p. In Dubai, the Minister showed Victim-1 materials that appeared to demonstrate how profitable Mine-1 would be. Because the Minister did not speak the same language as Victim-1, all communication again was translated by BELAN.

q. The Minister provided Victim-1 with a previously prepared partnership agreement. This agreement appeared to grant Victim-1 an 85% interest in Mine-1, with a 15% interest for a particular individual represented by BELAN to be the Minister's daughter (the "Minister's Daughter"). The Minister informed Victim-1 that her interest in Mine-1 must be in her daughter's name due to government restrictions.

r. In or about May 2011, BELAN informed Victim-1 that the Minister and the Minister's Daughter would like to meet Victim-1 in Nice, France. Victim-1 agreed to travel to Nice for the meeting.

s. Because neither the Minister nor the Minister's Daughter spoke the same language as Victim-1, all communication was translated by BELAN. Victim-1 was surprised that the Minister's Daughter did not speak English, since BELAN told Victim-1 that the Minister's Daughter had recently graduated from Yale University in the United States. BELAN stated that the Minister's Daughter had not needed to learn English because she had studied Russian literature.

t. During the trip to Nice, Victim-1 was introduced to a particular individual represented by BELAN to be a wealthy buyer interested in purchasing mine products ("Buyer-2"). Because Buyer-2 did not speak the same language as Victim-1, all communication was translated by BELAN.

u. While in Dubai and Nice, Victim-1, BELAN, the Minister, and the Minister's Daughter stayed in expensive hotels and ate together at expensive restaurants. Victim-1 was not charged for hotel expenses, but did pay for personal travel expenses and meals for those who attended the trips.

v. Following the meeting in Nice, Victim-1 wired approximately $1 million to a Ukrainian bank account to fund the purchase of Mine-1.

8

w.  From in or about June 2011 to in or about July 2013, Victim-1 wired approximately $3.5 million to a Ukrainian bank account in order to fund the purchase of Mine-1, as well as required licenses and machinery.

x.  All aspects of these purchases were arranged by BELAN.  Victim-1 authorized BELAN to access and use funds wired to the Ukrainian bank account for the purpose of acquiring Mine-1.

## VICTIM-1 INDUCED TO INVEST IN MINE-2

7.  Based on my interview with Victim-1, as well as my review of documents and other records provided by Victim-1, I have learned, among other things, the following:

a.  In or about February 2014, VALENTYN BELAN, a/k/a "Belan Valentin," a/k/a "Belan Valentyn," a/k/a "Belan Valentyn Volodymyrovych," a/k/a "Belan Valentyn Volodymyrovich," a/k/a "Valentino," the defendant, proposed that Victim-1 invest in a second mine ("Mine-2") that BELAN represented was currently operating in Ukraine.

b.  BELAN told Victim-1 that the previous owner of Mine-2 had died without heirs, and that the Minister could arrange for the sale of Mine-2 to Victim-1 for approximately $10.5 million.

c.  Victim-1 informed BELAN that Victim-1 did not have sufficient funds to purchase Mine-2.  In response, BELAN suggested that Victim-1 sell an office building in Hong Kong that Victim-1 owned (the "Office Building") in order to obtain sufficient funds.

d.  In or about May 2014, BELAN arranged for a man represented by BELAN to be a Russian oil businessman and a woman represented by BELAN to be the businessman's daughter (the "Oil Heiress" and, collectively, the "Purchasers"), to travel to Hong Kong to purchase the Office Building.  Because the Purchasers did not speak the same language as Victim-1, all communication was translated by BELAN.

e.  Victim-1 ultimately agreed to sell the Office Building to the Purchasers for approximately $13 million.  Shortly thereafter, the Purchasers claimed to have wired approximately $2.1 million to Victim-1's Ukrainian bank account, to which BELAN had been given access.

f.  Victim-1 believed that the $2.1 million had been deposited into the Ukrainian bank account, because BELAN provided

Victim-1 with a document that appeared to be a bank statement from the account reflecting the $2.1 million payment.

  g. The Purchasers also wired approximately $200,000 into Victim-1's bank account in Hong Kong in connection with the sale of the Office Building.

  h. In or about May 2015, BELAN informed Victim-1 that the balance owed by the Purchasers – approximately $10.5 million – had been paid in cash by delivering United States currency to BELAN in Ukraine.

  i. To confirm receipt of the outstanding balance, BELAN sent Victim-1 images of BELAN surrounded by piles of what appeared to be stacks of United States currency.  BELAN also provided Victim-1 with a document that appeared to be a bank statement showing that the funds had been deposited into Victim-1's Ukrainian bank account.

  j. BELAN subsequently told Victim-1 that the funds were used to purchase Mine-2, as well as to pay various government fees and surcharges.

  k. In or about late 2016, BELAN introduced Victim-1 to NIKA KHRYSTYCH, a/k/a "Veronika Melnichenko," the defendant, whom BELAN represented was an important assistant to the Minister. BELAN told Victim-1 that KHRYSTYCH would be primarily responsible for managing Mine-2.

  8. Based on Victim-1's description of subsequent statements made to Victim-1 by OLENA CHUMACHENKO, the defendant, as well as my review of images sent by VALENTYN BELAN, a/k/a "Belan Valentin," a/k/a "Belan Valentyn," a/k/a "Belan Valentyn Volodymyrovych," a/k/a "Belan Valentyn Volodymyrovich," a/k/a "Valentino," the defendant, the money in the images BELAN sent to Victim-1 appears to be counterfeit currency.

  9. Based on my review of publicly-filed litigation documents, including a sworn affidavit filed by NIKA KHRYSTYCH, a/k/a "Veronika Melnichenko," in support of VALENTYN BELAN, a/k/a "Belan Valentin," a/k/a "Belan Valentyn," a/k/a "Belan Valentyn Volodymyrovych," a/k/a "Belan Valentyn Volodymyrovich," a/k/a "Valentino," the defendants, in the civil case captioned *Chumachenko, et al. v. Belan*, Case No. 18-CV-09728 (LTS), currently pending in the United States District Court for the Southern District of New York, I have learned that KHRYSTYCH was employed as BELAN's assistant in or about 2016.

10. In addition, based on Victim-1's description of subsequent statements made to Victim-1 by OLENA CHUMACHENKO, the defendant, it appears that NIKA KHRYSTYCH, a/k/a "Veronika Melnichenko," the defendant, is in a romantic relationship with VALENTYN BELAN, a/k/a "Belan Valentin," a/k/a "Belan Valentyn," a/k/a "Belan Valentyn Volodymyrovych," a/k/a "Belan Valentyn Volodymyrovich," a/k/a "Valentino," the defendant, and currently resides with BELAN at his residence within the Southern District of New York.

### VICTIM-1'S OIL INVESTMENT

11. Based on my interview with Victim-1, as well as my review of documents and other records provided by Victim-1, I have learned, among other things, the following:

   a. In or about August 2015, VALENTYN BELAN, a/k/a "Belan Valentin," a/k/a "Belan Valentyn," a/k/a "Belan Valentyn Volodymyrovych," a/k/a "Belan Valentyn Volodymyrovich," a/k/a "Valentino," the defendant, and the Oil Heiress traveled to Hong Kong to meet with Victim-1.

   b. The Oil Heiress proposed to make Victim-1 a 10% partner in her oil business. Because the Oil Heiress did not speak the same language as Victim-1, all communications again were translated by BELAN.

   c. Victim-1 agreed to provide the Oil Heiress with approximately $800,000 to obtain a Russian oil license. However, because Victim-1 did not have sufficient funds in order to purchase the license, Victim-1 instead shipped two valuable vehicles, a Bentley car and a McLaren car, from Hong Kong to be sold in the United Kingdom.

   d. BELAN later provided Victim-1 with a document that BELAN represented was a Russian oil license.

   e. Additionally, in or about August 2015, the Oil Heiress represented to Victim-1 that she was facing financial difficulties. In order to raise funds, the Oil Heiress asked Victim-1 to sell the Office Building on her behalf.

   f. In or about December 2016, Victim-1 located a buyer and resold the Office Building for approximately $9.5 million.

   g. The Oil Heiress requested that Victim-1 wire approximately $6.3 million - representing the purchase price of

the Office Building less the amount necessary to pay off an existing mortgage – to a United States bank account held in the name of OLENA CHUMACHENKO, the defendant.

       h.    In or about July 2017, Victim-1 borrowed an additional $2.5 million that the Oil Heiress represented was necessary to resolve financial difficulties.

      12.    Based on Victim-1's description of subsequent statements made to Victim-1 by OLENA CHUMACHENKO, the defendant, I have learned that CHUMACHENKO traveled to the United Kingdom in order to receive the vehicles described above in ¶ 11(c), and that CHUMACHENKO sold or caused the vehicles to be sold in Liverpool.

      13.    Based on my review of financial records, including bank documents concerning accounts held by OLENA CHUMACHENKO, the defendant, wires corresponding to the approximate amount described above in ¶ 11(g) were sent by Victim-1 to one or more United States banks accounts held by CHUMACHENKO.

      14.    Based on my review of similar records, in or about February 2017, additional wires were received in a United States bank account held by OLENA CHUMACHENKO, the defendant, from a bank account associated with an automobile dealer in Liverpool.

<u>PURPORTED PROBLEMS WITH THE MINES</u>

      15.    Based on my interview with Victim-1, as well as my review of documents and other records provided by Victim-1, I have learned, among other things, the following:

       a.    In or about December 2016, VALENTYN BELAN, a/k/a "Belan Valentin," a/k/a "Belan Valentyn," a/k/a "Belan Valentyn Volodymyrovych," a/k/a "Belan Valentyn Volodymyrovich," a/k/a "Valentino," the defendant, told Victim-1 that the Minister had been diagnosed with a serious illness. BELAN then introduced Victim-1 to another woman represented by BELAN to be a deputy minister in the Ukrainian government (the "Deputy Minister").

       b.    BELAN told Victim-1 that the Deputy Minister would act in the Minister's place as Victim-1's mining partner.

       c.    In or about July 2017, BELAN told Victim-1 that Mine-2 had begun production. BELAN further told Victim-1 that a certain quantity of material must be mined before any sales could be made.

12

        d.    In or about September 2017, BELAN informed Victim-1 that the Minister had died.  BELAN also stated that the Minister had been funding production at Mine-2 by paying approximately $400,000 per month for expenses such as workers' wages.

        e.    BELAN told Victim-1 that the Minister's death had occurred before enough material had been mined to effectuate a sale.  BELAN further told Victim-1 that the Minister's death had resulted in a stoppage of work at Mine-2.

        f.    BELAN stated that it would cost approximately $1.2 million to resume the work necessary to mine a sufficient quantity of material to sell.

### FRAUDULENT ACQUISITION OF VICTIM-1'S HOME

    16.    Based on my interview with Victim-1, as well as my review of documents and other records provided by Victim-1, I have also learned, among other things, the following:

        a.    In or about December 2017, Victim-1 agreed to sell a primary residence in Hong Kong (the "Home") to pay amounts purportedly owed in connection with Victim-1's Ukrainian investments, including the property tax amounts described above in ¶¶ 5(k)-(l).

        b.    VALENTYN BELAN, a/k/a "Belan Valentin," a/k/a "Belan Valentyn," a/k/a "Belan Valentyn Volodymyrovych," a/k/a "Belan Valentyn Volodymyrovich," a/k/a "Valentino," the defendant, told Victim-1 that he had retained an accomplished lawyer (the "Lawyer") to handle the payments.

        c.    In or about December 2017, a particular individual ("Individual-1") wired approximately $600,000 to Victim-1 to allow Victim-1 to pay off the remaining mortgage on the Home.

        d.    Based on my review of financial records, including bank documents concerning accounts held by BELAN, approximately $615,000 was wired from BELAN to Individual-1 in or about November 2017.  Additionally, based on my review of similar records, Individual-1 was employed by BELAN in or about that period.

        e.    In or about January 2018, Victim-1 sold the Home for approximately $2.3 million.  All aspects of the sale and purchase of the Home were arranged by BELAN.

13

  f. In or about February 2018, a woman identified as a purchaser of the Home (the "Home Buyer") arrived in Hong Kong and took title to the Home.

  g. Following the sale of the Home, BELAN informed Victim-1 that all proceeds of the sale had been used to pay amounts purportedly owed by Victim-1.

  h. In or about March 2018, Victim-1 moved out of the Home.

## CONTINUING SOLICITATIONS BY DEFENDANTS

  17. Based on my interview with Victim-1, as well as my review of documents and other records provided by Victim-1, I have learned, among other things, the following:

  a. In or about April 2018, VALENTYN BELAN, a/k/a "Belan Valentin," a/k/a "Belan Valentyn," a/k/a "Belan Valentyn Volodymyrovych," a/k/a "Belan Valentyn Volodymyrovich," a/k/a "Valentino," the defendant, told Victim-1 that the Minister's Daughter had inherited the Minister's interests in Mine-1 and Mine-2.

  b. In or about May 2018, BELAN told Victim-1 that he had retained the Lawyer to negotiate the purchase of the Minister's Daughter's interests.

  c. BELAN stated that the Lawyer had negotiated a deal permitting Victim-1 to purchase the interests for approximately $2.5 million. BELAN also told Victim-1 that the option to purchase the interests would be available only for a limited time.

  d. Since in or about July 2018, BELAN has sent Victim-1 multiple messages requesting that Victim-1 send approximately $2.5 million to purchase these interests.

  e. In or about September 2018, BELAN informed Victim-1 that the Deputy Minister would like to meet Victim-1 in New York City. Victim-1 agreed to travel to New York for the meeting.

  f. While in New York, BELAN, the Deputy Minister, and Victim-1 stayed at an expensive hotel in Manhattan, within the Southern District of New York. Because the Deputy Minister did not speak the same language as Victim-1, all communication was translated by BELAN.

14

g.  During this trip, the Deputy Minister represented to Victim-1 that she had used her authority to resolve outstanding debts associated with Mine-2, and she urged Victim-1 to purchase the Minister's Daughter's interests for $2.5 million.  Victim-1 informed the Deputy Minister that he did not have sufficient funds to purchase the interests.

h.  In or about October 2018, Victim-1 requested that BELAN place him in contact with NIKA KHRYSTYCH, a/k/a "Veronika Melnichenko," the defendant, whom Victim-1 still understood to be managing affairs at Mine-2.

i.  BELAN told Victim-1 that KHRYSTYCH had been poisoned by radiation and placed in quarantine on a military base until at least 2019.

j.  Throughout 2018, up to and including in or about December 2018, BELAN has represented to Victim-1 that he remains in Ukraine, including on the site of Mine-2 and/or visiting KHRYSTYCH in quarantine.

k.  As described above in ¶¶ 9-10, based on my review of publicly-filed litigation documents, including a sworn affidavit filed by KHRYSTYCH in the civil case captioned *Chumachenko, et al. v. Belan*, Case No. 18-CV-09728 (LTS), as well as Victim-1's description of subsequent statements made to Victim-1 by OLENA CHUMACHENKO, the defendant, BELAN and KHRYSTYCH currently appear to be residing within the Southern District of New York.

l.  Up to and including in or about December 2018, BELAN has continued to pressure Victim-1 to pay approximately $2.5 million in order to purchase the Minister's Daughter's interests in Mine-1 and Mine-2.

### EXPOSURE OF THE FRAUDULENT SCHEME

18.  Based on my review of publicly-filed litigation documents, on or about October 23, 2018, OLENA CHUMACHENKO, the defendant, filed a petition in the United States District Court for the Southern District of New York seeking, in sum and substance, the return to Ukraine of two children (the "Children") whom CHUMACHENKO claimed had been wrongfully removed to the United States by VALENTYN BELAN, a/k/a "Belan Valentin," a/k/a "Belan Valentyn," a/k/a "Belan Valentyn Volodymyrovych," a/k/a "Belan Valentyn Volodymyrovich," a/k/a "Valentino," the defendant, the Children's father.

19. Based on my review of publicly-filed litigation documents in that matter, the civil case commenced by OLENA CHUMACHENKO, the defendant, is captioned *Chumachenko, et al. v. Belan*, Case No. 18-CV-09728 (LTS).

20. Based on my interview with Victim-1, I have learned, among other things, that on or about October 26, 2018, OLENA CHUMACHENKO, the defendant, contacted Victim-1 and spoke with Victim-1 by phone.

21. Based on my interview with Victim-1, I have learned that during that call OLENA CHUMACHENKO, the defendant, told Victim-1, in sum and substance, the following:

    a. CHUMACHENKO had been in a long-term romantic relationship with VALENTYN BELAN, a/k/a "Belan Valentin," a/k/a "Belan Valentyn," a/k/a "Belan Valentyn Volodymyrovych," a/k/a "Belan Valentyn Volodymyrovich," a/k/a "Valentino," the defendant, for a number of years.

    b. All of Victim-1's investments and dealings with BELAN had been part of a fraudulent scheme.

    c. CHUMACHENKO was currently engaged in litigation with BELAN concerning the custody of the Children.

    d. The Home Buyer who took title to the Home was in fact CHUMACHENKO's sister.

    e. CHUMACHENKO was fearful of losing custody of the Children, and of consequences arising from CHUMACHENKO's participation in BELAN's fraudulent scheme.

    f. CHUMACHENKO offered to return title to the Home to Victim-1.

22. Based on my interview with Victim-1, as well as my review of documents and other records provided by Victim-1, I have learned that, subsequent to the call from OLENA CHUMACHENKO, the defendant, Victim-1 emailed CHUMACHENKO a document returning title to the Home for execution by the Home Buyer.

23. Based on my interview with Victim-1, as well as my review of documents and other records provided by Victim-1, I have learned that the Home Buyer executed the document returning title to the Home, and OLENA CHUMACHENKO, the defendant, returned the executed document to Victim-1.

16

24. Based on my review of financial records, including bank documents concerning accounts held by VALENTYN BELAN, a/k/a "Belan Valentin," a/k/a "Belan Valentyn," a/k/a "Belan Valentyn Volodymyrovych," a/k/a "Belan Valentyn Volodymyrovich," a/k/a "Valentino," and OLENA CHUMACHENKO, the defendants, I have further learned, among other things, the following:

a. In or about 2016 and 2017, CHUMACHENKO received several million dollars from Victim-1 through international wires to United States bank accounts held by CHUMACHENKO.

b. CHUMACHENKO withdrew millions of dollars from these accounts, including by wiring and transferring funds to domestic and international bank accounts held by BELAN and other individuals.

c. For example, in or about October 2017, CHUMACHENKO wired funds totaling more than $5.4 million to a Ukrainian bank account held by BELAN.

d. BELAN also received funds from other individuals associated with the fraudulent scheme.

e. For example, BELAN directed Victim-1 to make certain payments to a United States bank account held by a particular individual ("Individual-2"). Based on my review of publicly-filed litigation documents, including a sworn affidavit filed by Yudin in the civil case captioned *Chumachenko, et al. v. Belan*, Case No. 18-CV-09728 (LTS), I know that Individual-2 is BELAN's brother. Based on my review of financial records, including bank documents concerning accounts held by BELAN and Individual-2, I have learned that, in or about March 2017, Yudin transferred approximately $1.8 million to a bank account held by BELAN.

f. BELAN withdrew millions of dollars from his bank accounts, including by wiring and transferring funds to domestic and international bank accounts held by him and other individuals.

17

WHEREFORE, the deponent respectfully requests that warrants be issued for the arrests of VALENTYN BELAN, a/k/a "Belan Valentin," a/k/a "Belan Valentyn," a/k/a "Belan Valentyn Volodymyrovych," a/k/a "Belan Valentyn Volodymyrovich," a/k/a "Valentino," OLENA CHUMACHENKO, and NIKA KHRYSTYCH, a/k/a "Veronika Melnichenko," the defendants, and that they be arrested and imprisoned, or bailed, as the case may be.

JUSTIN ELLARD
Special Agent
United States Attorney's Office for the
Southern District of New York

Sworn to before me this
3rd Day of December 2018

HONORABLE ONA T. WANG
United States Magistrate Judge
Southern District of New York